THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| GWR INVESTMENTS, INC., | ) | 8:04CV441 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| EXECUTIVE RISK SPECIALTY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

This is a diversity action for declaratory relief[1] to determine the rights, duties, and obligations of the parties under a policy of insurance. Plaintiff GWR Investments, Inc., ("GWR") is a registered broker-dealer that offers investment services. GWR purchased liability insurance from defendant Executive Risk Specialty Insurance Company ("ERSIC") to protect itself from claims made by dissatisfied clients. At issue in this case is the amount of policy proceeds available to plaintiff GWR to reimburse it for losses incurred in ten securities arbitrations that were filed with the National Association of Securities Dealers ("NASD") against GWR during the 2003 and 2004 policy periods.[2]

---

[1]The parties have stipulated to the dismissal of Plaintiff's second cause of action for bad faith and to three of Defendant's six defenses. The only pending cause of action is one for declaratory judgment and the remaining defenses are failure to state a claim, failure to mitigate damages, and that Plaintiff is subject to one $100,000 per-claim limit of liability under the 2003 insurance policy because of the insurance contracts' "related-claims" provisions. (See Filing 16, Amended Complaint; Filing 18, Answer; Filing 29, Procedural Stipulation for Trial on Stipulated Facts; Filing 31, Order Dismissing Cause of Action and Defenses.)

[2]The parties have submitted this matter on stipulated facts and documentary evidence. (Filings 30 & 37.) The parties have waived all objections as to the

1

The ERSIC liability policies for the 2003 and 2004 coverage periods contained coverage limits of $100,000 for a single claim and $250,000 in the aggregate. ERSIC has paid $100,000 in coverage for all claims made against GWR during 2003 and has denied coverage for claims made against GWR during the 2004 policy period. GWR asserts that it is entitled to the $250,000 aggregate limit of the 2003 policy (of which ERSIC has already paid $100,000), and to the $100,000 per-claim limit of liability under the 2004 policy.

## I. FINDINGS OF FACT

1.  Plaintiff GWR Investments, Inc., is a Nebraska corporation headquartered in Omaha, Nebraska.[3]

2.  Defendant Executive Risk Specialty Insurance Company, a Connecticut corporation, is an insurance company that maintains its principal place of business in Warren, New Jersey.

3.  ERSIC issued the following successive insurance policies, numbered 8171-0133, listing GWR as the named insured:

> (a)  the "Brokeredge℠ Securities Brokerage Executive and Professional Liability Policy," for the policy period of 12:01 a.m. on February 19, 2003, to 12:01 a.m. on February 19, 2004 (the

---

authenticity and admissibility of the documentary evidence presented to the court. (Filing 29, Procedural Stipulation for Trial on Stipulated Facts ¶ 1; Filing 30, Stipulation of Facts ¶¶ 13-14.) Because the procedural posture of this case is akin to a bench trial under Fed. R. Civ. P. 52(a), I shall "find the facts specially and state separately [my] conclusions of law thereon." Id.

[3]Facts without citations to the record may be found in the parties' Stipulation of Facts. (Filing 30.)

"2003 policy"); and

(b)     the same-titled policy issued for the policy period of 12:01 a.m.
        on February 19, 2004, to 12:01 a.m. on February 19, 2005 (the
        "2004 policy").

4.     The 2003 and 2004 policies cover different policy periods.  Otherwise,
the policies are identical in all material respects, including the following: (a) each
policy is a "claims-made" policy; and (b) each policy provides for a $100,000 per-
claim limit of liability, with a maximum aggregate limit of liability of $250,000 for
all claims.

5.     The "Insuring Agreement" of the "Professional Liability Coverage Part"
of the 2003 and 2004 policies provides: "The Underwriter will pay on behalf of the
**Insured Loss** from **Claims** first made against the **Insured** during the **Policy Period**
. . . for **Wrongful Acts** first committed on or after the **Retroactive Date**."[4]  (Filing
37, Ex. 1, at D02924 (2003 Policy) & Ex. 2, at D02966 (2004 Policy).)  The policies
define "Claim" as a "written demand received by an **Insured** seeking monetary
damages, including any civil legal proceeding or arbitration against an **Insured**."
(Id.)

6.     The 2003 and 2004 policies state that "[a]ll **Related Claims** will be
treated as a single **Claim** made when the earliest of such **Related Claims** was first
made . . . ."  (Filing 37, Ex. 1, at D02910 (2003 Policy) & Ex. 2, at D02951 (2004
Policy).)  "Related Claims" is defined as follows:

"**Related Claims**" means all **Claims** for **Wrongful Acts** based on,

---

[4]The bold terms in this quoted language also appear in bold in the 2003 and
2004 policies, denoting that such terms are defined elsewhere in the policies.

arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events.  In clarification and not in limitation of the foregoing, all **Claims** involving **Securities** of any entity which has become the subject of a bankruptcy, insolvency, trusteeship, receivership, liquidation, or reorganization shall be deemed to constitute **Related Claims**, and all **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same offering of any entity's **Securities** shall be deemed to constitute **Related Claims**.

(Filing 37, Ex. 1, at D02906 & Ex. 2, at D02947.)

7.    The following seven arbitrations were filed with the National Association of Securities Dealers against GWR and other parties associated with GWR on the dates indicated, which fall within the 2003 policy period:

| Date Filed | Caption and Parties |
|---|---|
| April 11, 2003 | Elizabeth Trueman v. Larry M. Pence & GWR Inv., Inc. ("Trueman") |
| August 8, 2003 | Darrell and Kathy Onken v. Larry M. Pence & GWR Inv. Inc. ("Onken") |
| August 8, 2003 | Carol R. Roth v. Larry M. Pence & GWR Inv., Inc. ("C. Roth") |
| August 22, 2003 | Robert M. Roth, Trustee, South Lincoln Family Physicians PC Profit Sharing Plan v. Larry M. Pence & GWR Inv., Inc. ("R. Roth") |

4

| August 22, 2003 | Eugene J. and Kathleen R. Gau v. Larry M. Pence & GWR Inv., Inc. ("Gau") |
| September 26, 2003 | Charles R. and Eleanor J. Kubin v. Larry M. Pence & GWR Inv., Inc. ("Kubin") |
| October 28, 2003 | Linda Kisler v. Larry M. Pence & GWR Inv., Inc. ("Kisler") |

8.     The parties agree that the Onken, C. Roth, R. Roth, Gau, and Kubin arbitrations exclusively involved the same offering of securities referred to as "IBF-7 notes," which were issued by the IBF Special Purpose Corporation, a wholly-owned subsidiary of InterBank Funding Corp. ("InterBank"), and that InterBank voluntarily placed itself, the IBF Special Purpose Corporation, and other subsidiaries into bankruptcy in June 2002.  Thus, the parties do not dispute that the claims brought by Onken, C. Roth, R. Roth, Gau, and Kubin are "related claims" as defined by the 2003 insurance policy at issue.[5]

9.     The parties disagree about whether the arbitrations brought by Trueman and Kisler are "related claims" within the meaning of the 2003 policy, as these arbitrations contained allegations about the IBF-7 notes, but also made claims having nothing to do with the IBF-7 notes.

---

[5]The parties' Stipulation of Facts states that GWR has agreed to forego any argument that the Onken, C. Roth, R. Roth, Gau, and Kubin arbitrations are not "related claims," as that term is defined by the 2003 policy.  Further, GWR explicitly admits in its brief that "[f]ive . . . former clients (Gau, Onken, Kubin, C. Roth, and R. Roth) made claims in separate arbitration proceedings against GWR during the 2003 Policy Period, all of which dealt exclusively with Interbank."  (Filing 35, Pl.'s Corrected Opening Br. at 8 (emphasis added).)

10.    The Trueman Statement of Claim (Filing 37, Ex. 3) charged GWR and its agents with wrongdoing regarding three investment accounts: (1) an "IRA account," consisting of Elizabeth Trueman's deceased husband's retirement account that was transferred to Ms. Trueman upon his death; (2) an "Estate Account," into which her husband's account was transferred upon his death; and (3) Ms. Trueman's own account.  The allegations relating to the first two of these accounts do not involve the IBF-7 notes, while the allegations concerning Ms. Trueman's own account exclusively relate to the IBF-7 notes.  Trueman sought $492,445 in actual damages, $137,626 of which was attributable to IBF-7 note-related losses.  (Id. ¶¶ 52, 97.)

11.    Specifically, Ms. Trueman alleged that GWR failed to properly supervise its sales manager, Larry Pence, who engaged in various wrongful acts on different days in connection with Trueman's investment accounts.[6]  First, Trueman contended that upon her husband's death on December 23, 1999, Pence and GWR immediately and improperly took control of Mr. Trueman's IRA account and sold 17 of the 25 securities in that account without Ms. Trueman's knowledge or authority.  Ms. Trueman claimed that as soon as the account was transferred to her name in February 2000, Pence sold four more positions without authority, only three of which were the type of securities that met Ms. Trueman's investment objectives, which were to minimize risk, preserve assets, seek income, and retire in a short period of time.  (Id. ¶¶ 10, 25-36.)  Ms. Trueman also alleged that in March of 2000, Pence and GWR recommended the purchase of "little known, highly speculative, high tech securities," such as First Bandwith Units, First Wireless Units, Marchfirst, Inc., Rare Medium

[6]According to Ms. Trueman's Statement of Claim and Request for Arbitration, Ms. Trueman was a 61-year-old widow employed as a bookbinder who had no investment experience before her husband's sudden death. Further, Mr. Trueman was Senior Vice President at GWR under Larry Pence's supervision when Mr. Trueman died, and the Truemans had been social friends of Pence and his wife. (Filing 37, Ex. 3 ¶¶ 3-4.)

Group, and Amgen, Inc., even though such securities were not suitable for Trueman's accounts, and that Pence and GWR recommended that Trueman retain unsuitable "high-risk" securities such as Level 3 Communications, Qualcomm, Inc., and SUNW. (Id. ¶¶ 33, 34.)  Ms. Trueman further alleged that in April of 2000, Pence and GWR recommended the purchase of seven mutual funds from seven different mutual fund families that were medium- to high-risk growth funds, contrary to Trueman's investment needs and goals, and in May of 2000 GWR purchased more shares of these seven mutual funds.  (Id. ¶ 35.)  Ms. Trueman contended that Pence's and GWR's misconduct "continued for the remainder of the year 2000 and early 2001," such as Pence's purchase of Aim Dent Demographic Trends B shares late in 2000. (Id. ¶ 36.)  Ms. Trueman alleged that Pence and GWR caused losses to her IRA account in the amount of $178,000.  (Id. ¶ 11.)

12.     Ms. Trueman's arbitration claim against GWR also involved an estate account which was established when GWR transferred Mr. Trueman's personal account to the estate in February of 2000.  Trueman alleged that in March 2000, Pence sold nine of the "high-tech" stocks[7] that were in Mr. Trueman's account when he died.  (Id. ¶¶ 37-38.)  According to Ms. Trueman's claim, in April 2000 Pence recommended the purchase of $54,499 in securities in three unsuitable, high-risk, high-tech companies, including Kulicke & Soffa Industries, Inc., Applied Materials, Inc., and 360Networks, Inc.  Trueman's claim alleges that "these recommendations were unsuitable in light of both the investment objective of the Claimant Trueman and/or the investment objectives of an estate personal representative under the Nebraska Probate Code, *Neb. Rev. Stat. § 30-2476* and the Nebraska Uniform Prudent Investor Act, *Neb. Rev. Stat. § 8-2211*.  (Exhibits 5 & 6.)  These two statutes limit investment in an estate securities account[] to federally insured interest-bearing

_____

[7]The "high-tech" stocks "included but are not limited to":  Level 3 Communications, Inc., Qwest Communications, Cisco Systems, Inc., Metromedia Fiber Network, Inc., Siebel Systems, Inc., MCI Worldcom, Inc., Intervoice Brite, Inc., and PSINET, Inc.  (Id. ¶ 37.)

7

securities, marketable mortgages, and other prudent investments." (Id. ¶ 38.) Ms. Trueman alleged that Pence and GWR failed to recommend the sale of these "unsuitable securities" as their market value fell in the summer and fall of 2000, and that Pence's false and misleading statements, forgeries, fraud, unsuitable recommendations, and GWR's failure to supervise Pence and succeeding brokers caused losses in the estate account in the amount of $176,819. (Id. ¶ 41.)

13.     Ms. Trueman's arbitration claim also included allegations relating to her personal account—that is, in the summer of 2000, Pence fraudulently solicited Trueman to purchase "11% participating notes" from a start-up company called IBF Special Purpose Corporation, a subsidiary of InterBank, that was seeking $25,000,000 from accredited investors; that Pence made a number of false and/or misleading statements about InterBank to induce Trueman to purchase the InterBank notes, including representing that the investment was safe without disclosing the high risks that were "inherent in the IBF-sp business plan"; that Pence falsely stated in the subscription agreement that Ms. Trueman was an accredited investor with net assets in excess of $1,000,000, and then forged Ms. Trueman's signature; that such fraudulent conduct caused losses in her personal investment account; and that InterBank subsequently filed for bankruptcy. (Id. ¶¶ 43-44, 47, 55.)

14.     Linda Kisler also made claims against GWR in an arbitration demand during the 2003 policy period.[8]  The demand alleged that GWR and Larry Pence engaged in "two frauds" against Kisler, causing a total loss of $260,409. (Filing 37,

---

[8]Kisler's Statement of Claim and Request for Arbitration stated that she was a retired administrator from the Millard, Nebraska, School District and expected that, with some part-time teaching and a small inheritance, she could live on her retirement income and provide assistance to her brother, nephews, and nieces. Her investment objective was "the preservation of her capital and income for retirement." Ms. Kisler had little investment experience and relied upon Pence and GWR for investment advice. (Filing 37, Ex. 11 ¶¶ 2, 17.)

Ex. 11 ¶¶ 1, 89.)  The first fraud allegedly occurred in early 2000 when Pence and GWR switched Kisler's investments in her 403(b) teacher's retirement account from mutual funds to an American Skandia variable annuity solely in an effort to generate commissions for Pence, resulting in $160,409.19 in losses to Kisler.  Specifically, Kisler's arbitration demand alleged that her losses with regard to the "first fraud" resulted from GWR's and Pence's "unsuitable and self[-]serving recommendation to redeem the mutual fund A shares upon which [Kisler] had paid a commission and purchasing the Skandia Annuity with a new 8.5% surrender charge." (Id. ¶¶ 1, 3, 12-13, 23-25.)  The "second fraud" occurred later in 2000 when Pence and GWR allegedly made false and misleading statements to Kisler to induce her to purchase "IBF-7 11%  notes" as part of an investment offering in InterBank, which subsequently filed for bankruptcy. (Id. ¶¶ 1, 4-11, 27-40.)  Kisler alleged that Pence and GWR told her that the IBF-7 notes were a safe investment without disclosing the high risks inherent in the business plan; that GWR and Pence had conducted an adequate due-diligence investigation of InterBank and IBF-7 when they had not; and that Kisler qualified as an "accredited investor" for purposes of the InterBank investment when she was not. The InterBank investment allegedly resulted in $100,000 in losses to Kisler.  (Id. ¶¶ 14-15.)

15.    GWR has satisfied all applicable retentions under the 2003 policy with respect to the above-listed seven arbitrations, and GWR has suffered insured losses in connection with these arbitrations in excess of the applicable coverage limits of the 2003 policy.

16.    ERSIC has already provided GWR with $100,000 in coverage under the 2003 policy.

17.    During the 2004 policy period, the following three arbitrations were filed with the NASD against GWR and other parties associated with GWR on the dates indicated:

| Date Filed | Caption and Parties |
|---|---|
| March 19, 2004 | David A. and Theresa A. Cannon v. Larry M. Pence, Gail Werner-Robertson, GWR Inv., Inc., and Royal Alliance Assoc., Inc. ("Cannon") |
| March 29 or 30, 2004 | Catherine Mason v. Larry M. Pence, Gail Werner-Robertson and GWR Inv., Inc. ("Mason") |
| April 6, 2004 | Dana L. and Marge A. Elrod v. Janet Malsam, Gail Werner-Robertson & GWR Inv., Inc. ("Elrod") |

18.   The parties agree that the Cannon, Mason, and Elrod arbitrations exclusively involved the InterBank securities described above.  Accordingly, GWR has agreed to forego any argument that the Cannon, Mason, and Elrod arbitrations are not "related claims," as that term is defined by the 2004 policy.[9]

19.   GWR has satisfied all applicable retentions under the 2004 policy with respect to the above-listed three arbitrations, and GWR has suffered insured losses in connection with these arbitrations in excess of the applicable coverage limits of the 2004 policy.

20.   GWR and ERSIC agree that jurisdiction and venue are proper in the United States District Court for the District of Nebraska and that this court should

_____

[9]GWR explicitly admits that "three claims (Cannon, Elrod, and Mason) were made against GWR in three separate arbitration proceedings.  Each of these claims against GWR dealt exclusively with Interbank."  (Filing 35, Pl.'s Corrected Opening Br. at 10 (emphasis added).)

10

apply Nebraska law to the interpretation of the insurance policy at issue and to all substantive, non-procedural issues in this action.

## II.  CONCLUSIONS OF LAW

While the parties agree that the claims brought by Onken, C. Roth, R. Roth, Gau, Kubin, Cannon, Mason, and Elrod are "related claims" as defined by the 2003 and 2004 insurance policies at issue, the parties do not agree about whether the arbitrations brought by Trueman and Kisler are "related claims."  Specifically, ERSIC asserts that all ten of the arbitrations brought against GWR in 2003 and 2004 are "related claims" within the meaning of the policies, and that all "related claims" are subject to "the [$100,000] per Claim limit of liability of the Policy in effect when the first of such Related Claims was made."  (Filing 36, Def.'s Br. at 6.)

In contrast, GWR argues that the Trueman and Kisler claims are not "related" because they involve not only the InterBank IBF-7 notes, but other securities and other wrongful acts.  As a result, GWR asserts that it is entitled to the $250,000 aggregate limit of liability under the 2003 policy (instead of the $100,000 per-claim limit of liability) and to the additional $100,000 per-claim limit of liability under the 2004 policy because three of the ten arbitrations were filed during the 2004 policy period.

### A.  Nebraska Insurance Law

Under Nebraska law, a policy of insurance is a contract, the meaning of which is a question of law for the court.  Poulton v. State Farm Fire & Cas. Cos., 675 N.W.2d 665, 669 (Neb. 2004).  The contract should be construed as a whole and effect given to every part thereof.  Guerrier v. Mid-Century Ins. Co., 663 N.W.2d 131, 135 (Neb. 2003).  When the terms of an insurance contract are clear, they are to be afforded their plain and ordinary meaning, as a reasonable person would understand

11

them.  Id. at 134.  "[A] contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms." Boutilier v. Lincoln Benefit Life Ins. Co., 681 N.W.2d 746, 750 (Neb. 2004).

> Under Nebraska law, a court interpreting a contract, such as an insurance policy, must first determine, as a matter of law, whether the contract is ambiguous.  Reisig v. Allstate Ins. Co., [645 N.W.2d 544 (Neb. 2002)].  A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.  Id.  The fact that parties to a document have or suggest opposing interpretations of the document does not necessarily, or by itself, compel the conclusion that the document is ambiguous.  Tighe v. Combined Ins. Co. of America, 261 Neb. 993, 628 N.W.2d 670 (2001).  An ambiguous insurance policy will be construed in favor of the insured.  Id.  The language of an insurance policy should be read to avoid ambiguities, if possible, and the language should not be tortured to create them.  Reisig v. Allstate Ins. Co., supra.

Guerrier, 663 N.W.2d at 135.  "Context is often central to the way in which policy language is applied: the same language may be found both ambiguous and unambiguous as applied to different facts."  Highwoods Properties, Inc. v. Executive Risk Indemnity, 407 F.3d 917, 923 (8th Cir. 2005).  "We will apply the ordinary meaning of particular terms to the facts of the case to determine if it is ambiguous as to those facts."  Id.

The policies at issue in this case are "claims-made" policies.  A claims-made policy is an "'agreement to indemnify against all claims made during a specified period, regardless of when the incidents that gave rise to the claims occurred.'" Continental Cas. Co. v. Calinger, 657 N.W.2d 925, 928 (Neb. 2003) (quoting Black's Law Dictionary 809 (7th ed. 1999)).

In interpreting limitations and exclusions in an insurance policy, the Nebraska Supreme Court has stated:

12

An insurance policy is a contract between the insurance company and the insured. As such, the insurance company has the right to limit its liability by including those limitations in the policy definitions. If those definitions are clearly stated and unambiguous, the insurance company is entitled to have those terms enforced.

Cornhusker Cas. Co. v. Farmers Mut. Ins. Co. of Nebraska, 680 N.W.2d 595, 600 (Neb. 2004) (quoting Safeco Ins. Co. of America v. Husker Aviation, Inc., 317 N.W.2d 745, 749 (Neb. 1982)). "Parties to an insurance contract may contract for any lawful coverage, and an insurer may limit its liability and impose restrictions and conditions upon its obligations under the contract if the restrictions and conditions are not inconsistent with public policy or statute." City of Scottsbluff v. Employers Mut. Ins. Co., 658 N.W.2d 704, 708 (Neb. 2003).

## B.  The 2003 ERSIC Insurance Policy

ERSIC asserts that "the entirety of [an] 'arbitration' constitutes a 'Claim'" under the definitions contained in its insurance policies, and that because each of the seven arbitrations filed against GWR during the 2003 policy period "in some way involved GWR's promotion of the IBF-7 Notes" and the bankrupt IBF Special Purpose Corporation, all seven arbitrations are "related claims" subject to the $100,000 per-claim limit of liability under the 2003 policy which ERSIC has already paid.  (Filing 36, Def.'s Br. at 15.)  I disagree.

The ERSIC policies define a "claim" as a "written demand received by an **Insured** seeking monetary damages, including any civil legal proceeding or arbitration against an **Insured**."  (Filing 37, Ex. 1, at D02924 (2003 Policy) & Ex. 2, at D02966 (2004 Policy) (underscoring added).)  The policies broadly define "claim" as a "written demand" received by an insured, here GWR, seeking monetary damages. Whether the "including any civil legal proceeding or arbitration" language is viewed as a phrase of enlargement (meaning "and" or "in addition to") or as an illustrative

13

phrase (specifying particular items included within general words already used), the definition does <u>not</u> state that a "claim" <u>is</u> a "civil legal proceeding or arbitration" exclusively, or that a "civil legal proceeding or arbitration" constitutes one, and only one, "claim," as ERSIC suggests. <u>See</u> Black's Law Dictionary 763 (6th ed. 1990) (depending upon context, "include" can be word of enlargement, illustrative application, or limitation). After a careful review of the arbitration demands filed as evidence in this case, I conclude that Trueman's Statement of Claim and Request for Arbitration contains three separate written demands seeking monetary damages—"claims" under the ERSIC policies—and Kisler makes two such demands.

Elizabeth Trueman's Statement of Claim and Request for Arbitration (Filing 37, Ex. 3) contains eight "Claims for Relief" that are designated as "counts."[10] Trueman alleges that these generic "counts" apply to Pence's and GWR's misconduct in three separate accounts: the IRA account, the estate account, and Ms. Trueman's personal account. Trueman's Statement of Claim and Request for Arbitration separately, and in detail, describes Pence's and GWR's alleged misconduct in each of these accounts and seeks three separate amounts of monetary damages for losses in each of these accounts: $178,000 in the IRA account; $176,819 in the estate account; and $137,626 in Trueman's personal account. (Filing 37, Ex. 3 ¶¶ 29-47, 52.)

While the <u>type</u> of misconduct alleged to have taken place in each of the three accounts is similar (i.e., making untrue statements, omitting material facts, making

---

[10]The "counts" contained in Trueman's Statement of Claim and Request for Arbitration are Violation of the Anti-Fraud Provisions of the Securities Laws of the United States and the State of Nebraska; Common Law Fraud; Breach of Fiduciary Duty by Pence and GWR; Breach of Fiduciary Duty by GWR; Common Law Negligence, Including Violation of Duties Owed the Claimant Arising out of Breach of the NASD's Rules of Fair Practice and Applicable SEC Rules; Breach of Contract; Failure to Supervise; and Punitive Damages. (Filing 37, Ex. 3.)

inappropriate investment recommendations, forgery, entering false information into GWR's books and records, executing unauthorized transactions), Trueman's arbitration demand clearly sets forth separate and unrelated transactions in three separate accounts, taking place in different time frames, and involving different securities.  Pence's and GWR's conduct in only one of the three accounts (Trueman's personal account) has any connection whatsoever to the IBF Special Purpose Corporation, InterBank, and the 11% participating notes.

Similarly, Kisler's arbitration demand (Filing 37, Ex. 11) alleges two separate and unrelated "frauds"—one occurring in connection with the switching of Kisler's investments in her teacher's retirement account from mutual funds to a variable annuity for the alleged purpose of generating commissions for Pence; and the other occurring in connection with the offer and sale of notes issued by the IBF Special Purpose Corporation.  Like Trueman, Kisler alleges eight "counts"[11] applicable to both "frauds," but demands two separate amounts of monetary damages for two separate courses of misconduct: $160,409.19 for Pence's and GWR's unsuitable recommendations regarding her teacher's retirement account, and $100,000 plus interest for Pence's and GWR's false and misleading statements, negligence, and unsuitable recommendations regarding the purchase of the IBF Special Purpose Corporation 11% notes.  (Filing 37, Ex. 11 ¶¶ 1-16, 22-45.)

Having concluded that the Trueman and Kisler Statements of Claim and Requests for Arbitration contain multiple "claims" within the meaning of the ERSIC policies, the next question is whether the Trueman and Kisler claims are "related claims" subject to the $100,000 per-claim limit of liability under the 2003 policy which ERSIC has already paid to GWR.  I conclude they are not.

ERSIC's 2003 and 2004 policies state that "[a]ll **Related Claims** will be

---

[11]Kisler's "counts" are identical to those in Trueman's arbitration demand.

treated as a single **Claim** made when the earliest of such **Related Claims** was first made . . . ."  (Filing 37, Ex. 1, at D02910 (2003 Policy) & Ex. 2, at D02951 (2004 Policy).)  "Related Claims" is defined as follows:

> "**Related Claims**" means all **Claims** for **Wrongful Acts** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events.  In clarification and not in limitation of the foregoing, all **Claims** involving **Securities** of any entity which has become the subject of a bankruptcy, insolvency, trusteeship, receivership, liquidation, or reorganization shall be deemed to constitute **Related Claims**, and all **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same offering of any entity's **Securities** shall be deemed to constitute **Related Claims**.

(Filing 37, Ex. 1, at D02906 & Ex. 2, at D02947.)

Trueman's arbitration claims involving the IRA and Estate Accounts and Kisler's claim involving her teacher retirement account do not involve the same or related facts, circumstances, situations, transactions, or events as those alleged to have occurred with the InterBank IBF-7 participating notes. Specifically, Ms. Trueman's allegations that Pence and GWR improperly took control of her deceased husband's IRA account; sold several securities in the IRA account without Ms. Trueman's knowledge or authority; and purchased—or recommended the purchase and/or retention of—securities and mutual funds that were not suitable for the IRA or estate accounts have no relationship whatsoever to Trueman's allegations that Pence and GWR fraudulently induced Trueman to purchase 11% participating notes from the IBF Special Purpose Corporation, a subsidiary of InterBank.  Nor do Kisler's allegations that GWR switched Kisler's investments in her 403(b) teacher's retirement account from mutual funds to an American Skandia variable annuity solely

16

in an effort to generate commissions for Pence involve the same facts, circumstances, situations, transactions, or events as those involved in her claim that Pence and GWR made false and misleading statements to induce her to purchase IBF-7 11% notes as part of an investment offering in the now-bankrupt InterBank.

I conclude that the Trueman IRA- and estate-account claims and the Kisler teacher-retirement-account claim are not "related" to the InterBank claims within the meaning of the 2003 and 2004 ERSIC policies. Cf. Highwoods Properties, Inc. v. Executive Risk Indemnity, Inc., 407 F.3d 917 (8th Cir. 2005) (under claims-made policy insuring corporation's directors and officers against claims made against them, two lawsuits were "related claims"[12] because both suits involved allegedly incomplete and deceptive communications to shareholders in relation to the same merger; both included many of the same factual allegations; and the second lawsuit could best be described as the "successor" to the first suit); Continental Casualty Co. v. Wendt, 205 F.3d 1258 (11th Cir. 2000) (in action by professional liability insurer against insured attorney seeking declaration that insurer had no duty to defend or indemnify insured against misrepresentation claims brought against attorney, court found two lawsuits "related" within plain meaning of insurance policy when both lawsuits involved single course of conduct designed to promote investment in same corporation and conduct at issue in both suits was arguably the same or related "in any common sense understanding of the word"); Admiral Ins. Co., Inc. v. Briggs, 264 F. Supp. 2d 460 (N.D. Tex. 2003) (in declaratory judgment action seeking determination that management liability insurer had no duty to defend or indemnify insured corporation or its officers or directors in underlying lawsuits, court found that three lawsuits

_____

[12]The "related claims" definition in Highwoods is the same as the definition involved in this case. That is, "related claims" are "all Claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." Highwoods, 407 F.3d at 922.

brought by investors claiming fraud and mismanagement were not a single "claim" within the meaning of the insurance policy because the lawsuits contained "different alleged misstatements, omissions and promises that occurred on different days to different individuals"); Executive Risk Indemnity, Inc. v. Integral Equity, L.P., 2004 WL 438936 (N.D. Tex. Mar. 10, 2004) (in declaratory judgment suit by insurer regarding its rights and obligations under insurance policy, court found underlying lawsuit with 12 causes of action contained 12 "claims" within meaning of insurance policy, but such claims were "related" (and therefore treated as one claim for purposes of the policy's liability limits) because all claims were based on related facts or series of facts: alleged inducement to invest in certain funds, mishandling of those funds, continuing misrepresentations about funds' performance, and resulting losses to some and enrichment to others).

ERSIC has paid GWR the $100,000 per-claim limit of liability under the 2003 policy on the theory that all claims filed in 2003 were "related," and therefore treated as a single "claim."  However, because there were three claims filed in 2003 against GWR that were not "related" to the InterBank claims, GWR is entitled to the $250,000 aggregate limit of liability under ERSIC's 2003 policy.

**C.  The 2004 ERSIC Insurance Policy**

GWR contends that it is entitled to the single-claim limit of $100,000 for the Cannon, Mason, and Elrod arbitration claims filed during the 2004 policy period. GWR admits that all three of these claims deal with InterBank, which ultimately filed bankruptcy, making the claims "related" within the meaning of the 2004 ERSIC policy and requiring such claims to be treated as a single "claim" for purposes of the policy coverage limits.  (Filing 35, Pl.'s Br. at 19-20.)

ERSIC, in contrast, maintains that the 2004 policy provides no coverage for the Cannon, Mason, and Elrod claims:

18

> Although *Cannon, Mason* and *Elrod*[] were filed during the Policy Period for the 2004 Policy, the 2004 Policy only provides coverage for "**Claims** first *made* against the **Insured** during the **Policy Period** . . . ."   The 2004 Policy provides when Related Claims are "*made*": "[a]ll Related Claims will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made . . . ."
>
> . . . .
>
> Under the language of the 2004 Policy . . . , the date that the Claim is *filed* does not determine coverage: the date when the Claim is *made* determines coverage.   The Insuring Agreement provides that "[t]he Underwriter will pay on behalf of the **Insured Loss** from **Claims** first *made* against the **Insured** during the **Policy Period** . . . ."

(Filing 36, Def.'s Br. at 23-24 (citations to stipulated facts omitted).)   Therefore, ERSIC argues, the <u>Cannon</u>, <u>Mason</u>, and <u>Elrod</u> claims must be treated as "made" during the 2003—not 2004—policy period because they are "related" to the <u>Onken</u>, <u>C. Roth</u>, <u>R. Roth</u>, <u>Gau</u>, and <u>Kubin</u> claims made in 2003.

In <u>Highwoods Properties, Inc. v. Executive Risk Indemnity, Inc.</u>, 407 F.3d 917 (8th Cir. 2005), the insured, Highwoods, purchased two successive claims-made policies from Executive Risk Indemnity, Inc.   The 1996-1998 policy insured Highwoods's directors and officers in the event claims were filed against them.   The 1998-2001 policy covered Highwoods's directors and officers, but also added coverage for Highwoods as an entity.   During the 1996-1998 policy period, Highwoods was sued as an entity in a lawsuit ("<u>Wright</u>") alleging breach of fiduciary duty in connection with a proposed merger.   Executive Risk denied coverage because the policy did not cover corporate entities, but only "Insured Persons."   During the 1998-2001 policy period, Highwoods was sued in a second lawsuit ("<u>Flake</u>") that alleged violations of federal securities laws in connection with the same merger that was the subject of the <u>Wright</u> lawsuit.   Executive Risk again refused coverage, stating that <u>Flake</u> was not a claim made during the 1998-2001 policy period because a

previous action (<u>Wright</u>) relating to the same merger was brought against the same defendants and "related claims are treated as having been made when the first claim was made." <u>Highwoods</u>, 407 F.3d at 919.  <u>Flake</u> was therefore considered to be a claim made under the 1996-1998 policy, which did not provide entity coverage.

Applying North Carolina law[13] regarding interpretation of insurance contracts, as well as "related-claim" policy language[14] that mirrors the language at issue in the case now before me, the Eighth Circuit Court of Appeals found that the <u>Wright</u> and <u>Flake</u> lawsuits were "related claims" within the meaning of the insurance policies; that "the claims therefore constitute[d] a single claim that was made outside the [1998-2001] policy period," and instead during the 1996-1998 policy period; that "entity coverage was not included in the [1996-1998] policy"; that coverage was therefore precluded for <u>Flake</u>; and summary judgment was appropriate for Executive Risk.  <u>Highwoods</u>, 407 F.3d at 925.  The court stated:

> In other words, although *Flake* is a company securities claim that was

---

[13]The North Carolina law cited by the Court of Appeals in <u>Highwoods</u> is not materially different from Nebraska's principles of insurance-contract construction, cited previously in this memorandum and order.

[14]The policy in <u>Highwoods</u> provided that "[a]ll Related Claims will be treated as a single Claim made when the earliest of such Related Claims was first made, or when the earliest of such Related Claims is treated as having been made." <u>Id.</u> at 922. The <u>Highwoods</u> policy also defined "related claims" as:

> all Claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

<u>Id.</u>

20

filed against Highwoods during the policy period, if *Flake* and *Wright* are "related claims," *Flake* will be treated as a continuation of *Wright*. Because *Wright* was made prior to and outside the policy period, *Flake* would also be considered to be made outside the policy period.

Id. at 922.

In the case at bar, the 2004 policy provided that "[a]ll **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made . . . ." (Filing 37, Ex. 2, at D02951.) The parties agree that the three arbitration claims filed in 2004—all involving InterBank—were "related" to those filed under the 2003 policy because the claims involve "Securities of any entity which has become the subject of a bankruptcy" and involve the "same offering of any entity's Securities." (Filing 37, Ex. 2, at D02947.) The plain and ordinary meaning of this language, as well as the reasoning of Highwoods, persuade me that the Cannon, Mason, and Elrod arbitration claims filed during the 2004 policy period are "related" to the Onken, C. Roth, R. Roth, Gau,and Kubin claims filed in the 2003 policy period, requiring that these claims be treated as a single claim made in 2003—that is, the "earliest" time the InterBank claims were "first made." Thus, GWR is not entitled to insurance coverage for the three arbitration claims filed against it in the 2004 policy period, and ERSIC properly denied such coverage. See Cornhusker Cas. Co. v. Farmers Mut. Ins. Co. of Nebraska, 680 N.W.2d 595, 600 (Neb. 2004) (insurance companies have the right to limit their liability by including limitations in policy definitions; if those definitions are clearly stated and unambiguous, the insurance company is entitled to have those terms enforced).

## D. Attorneys' Fees

The parties agree that GWR is entitled to recover attorneys' fees if it prevails. (Filing 38 at 13; Filing 36 at 29 n.11.) See Neb. Rev. Stat. Ann. § 44-359 (LexisNexis 2005) ("In all cases when the beneficiary . . . brings an action upon any

21

type of insurance policy . . . against any company . . . doing business in this state, the court, upon rendering judgment against such company . . . shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his or her recovery . . . ."). Because GWR has recovered on its claim for coverage under the 2003 policy, I shall grant GWR time to file an application for attorneys' fees.

### III. CONCLUSION

GWR is entitled to the aggregate limit of the 2003 ERSIC policy, $250,000, of which ERSIC has already paid $100,000. ERSIC is therefore liable to GWR for an additional $150,000 under the 2003 policy. However, GWR is not entitled to coverage for the three arbitration claims filed against it in the 2004 policy period, and ERSIC properly denied such coverage under the 2004 ERSIC policy.

Accordingly,

IT IS ORDERED:

1.    By separate document, judgment shall be entered in favor of plaintiff GWR Investments, Inc., and against defendant Executive Risk Specialty Insurance Company, in the amount of $150,000 for additional coverage owed under the "Brokeredge℠ Securities Brokerage Executive and Professional Liability Policy," for the policy period of 12:01 a.m. on February 19, 2003, to 12:01 a.m. on February 19, 2004, otherwise known as the "2003 Policy." The judgment shall also provide that Plaintiff GWR Investments, Inc., is not entitled to coverage by defendant Executive Risk Specialty Insurance Company under the same-titled policy issued for the policy period of 12:01 a.m. on February 19, 2004, to 12:01 a.m. on February 19, 2005, otherwise known as the "2004 policy."

2.     On or before December 13, 2005, plaintiff GWR Investments, Inc., may
       file an application for attorneys' fees pursuant to the provisions of
       NECivR 54.3 and 54.4.  The defendant may respond to the plaintiff's
       application on or before December 27, 2005.  The plaintiff may then
       reply to the defendant's response on or before January 6, 2006, after
       which time the plaintiff's application for attorneys' fees shall be deemed
       submitted for disposition.

November 23, 2005.

                              BY THE COURT:
                              s/ *Richard G. Kopf*
                              United States District Judge

23